T. P. SCOTT, Appellee, v. MELVIN C. SIMONS, Appellant.

FRAUD: Liability for Fraud—Knowledge of Fraud—Consumma-
1   tion of Contract—Effect. Consummation of an executory contract by a party thereto, with full knowledge that a fraud has been perpetrated upon him in the execution of the contract, works a complete waiver of the fraud and all damages flowing therefrom.

FRAUD: Actions—Waiver—Accepting Deed with Knowledge of
2   Fraud—Ratification. One who, with full knowledge that he has been fraudulently induced to execute a contract, accepts a deed in compliance with the contract, thereby ratifies and confirms the original fraud-induced contract and waives all claim for damages by reason of the fraud.

PRINCIPAL AND AGENT: The Relation—Termination—Brokers.
3   The relation of principal and agent is terminated *ipso facto* by the voluntary and mutual initiation by the parties of negotiations under which the agent proposes to buy and the principal proposes to sell the subject matter of the agency.

*Appeal from Osceola District Court.*— W. D. BOIES, Judge.

NOVEMBER 28, 1917.

ACTION to recover a balance alleged to be due plaintiff on the exchange of land. The opinion states the facts.—*Affirmed.*

*B. Radcliffe* and *Molyneux & Maher,* for appellant.

*T. M. Zink,* for appellee.

1. FRAUD: liability for fraud: knowledge of fraud: consummation of contract: effect.

GAYNOR, C. J.—I. Plaintiff brings this action in equity to recover a balance unpaid upon a written contract for the sale of certain land in Osceola County, and to impress upon and enforce against the land a vendor's lien for the unpaid balance. The facts out of which the controversy arises are substantially as follows:

The defendant was the owner of all of Section 14 in Township 1, Range 21 East, in the county of Stanley, state of South Dakota. In the month of June, 1914, he placed this land in the hands of the plaintiff, as agent, to sell or trade it for him at a valuation fixed at $11,000, the plaintiff to receive a commission therefor of 50 cents an acre, or about $320. On or about July following, the plaintiff called on the defendant in respect to said Dakota land, and said to him that there were some parties from the east on a visit who had a half section of land north of Hartley, in the county of Osceola, Iowa; that the land was part of an estate, and the parties were anxious to close it up, and that they would take the Dakota land in exchange; that they were asking $135 an acre, but he thought it could be got for $125 an acre. At this time, the commission was fixed that should be paid in the event that an exchange was consummated. The next day, plaintiff and defendant went to Osceola County and examined this land. Nothing was said further about the trade, plaintiff, however, affirming at all times that this land was worth $125 an acre. On the way

home from this visit to the land, the plaintiff said to the defendant:

"When I got home last night, the people who owned this land were waiting for me. They had to leave on an early train. I thought surely you folks would take this land, and so I bought it and will turn it over to you for just what I paid. I thought it was a good deal, and you surely would take it."

Defendant told him he didn't know whether he would take it or not. Defendant's father, who accompanied them, remarked: "If this is such a good deal, and the land is worth the money, why don't you keep it yourself?" And plaintiff said: "Well, there is a limit to what a man can own, and I am up to the limit. I am carrying all I can handle." He said the parties would take the Dakota land at the price of $11,000, the price at which it was listed. "We talked the matter over until we came to the town of Marcus. I then told him; 'If that is the way, I would take the land as he had represented.' " A contract was drawn, when they reached Marcus, as follows:

"This agreement, made this 22nd day of July, A. D. 1914, between T. P. Scott, of the county of Plymouth and state of Iowa, of the first part, and Melvin C. Simons, of the county of Cherokee and state of Iowa, of the second part, witnesseth, that in consideration of the stipulations herein contained and payments to be made as hereafter specified, the first party hereby agrees to sell unto the second party the following real estate, situated in the county of Osceola and state of Iowa and described as follows: The North Half (N½) of Section Twenty-four (24), in Township Ninety-eight North of Range Forty (40) West of the Fifth P. M., containing, according to the government survey thereof, three hundred twenty acres, less three and 77-100ths acres for school ground and road, for the sum of thirty-nine thousand five hundred dollars, on which the second

party has paid the sum of one thousand dollars, the receipt whereof is hereby acknowledged. The remaining principal shall be paid to the party of the first part at the time and in the manner following: Ninety-five hundred dollars payable cash, March 1, 1915. Assumes a mortgage of eighteen thousand dollars, dated March 1, 1915, due on March 1, 1920, with interest at 6 per cent per annum, with optional payments on any interest-paying date. For the balance, $11,000, the second party delivers to the party of the first part, on the first day of March, 1915, a warranty deed to the following real estate: All of Section Fourteen (14), in Township One (1) South, Range Twenty-one (21) East, Black Hills Meridian, in the county of Stanley, state of South Dakota. It is agreed that, if the party of the first part cannot furnish perfect title to the above described real estate, then in that case he shall refund the $1,000 to the party of the second part. The second party hereby further agrees and obligates himself, his heirs and assigns, that all improvements placed upon said premises shall remain thereon, and shall not be removed or destroyed, until final payment of said premises, and further that he will punctually pay said sums of money above specified, as it becomes due, and that he will regularly and seasonably pay all such taxes and assessments as may be lawfully imposed upon said premises, each party to pay the taxes for the year 1914. In case the said second party, his legal representatives or assigns, shall pay the several sums aforesaid, punctually and at the several times above limited, and strictly and literally perform all and singular of his agreements and stipulations aforesaid after their true tenor and intent, then the first party will make unto the second party, his heirs or assigns, upon request and surrender of this agreement, a deed conveying said premises in fee simple, with ordinary covenants of warranty, and subject to all taxes and assessments and to all liens and incumbrances created or imposed on said

premises by said second party or his assigns subsequent to the date hereof. First party agrees to furnish abstract showing a good and sufficient title, subject to the above named incumbrance and to legally establish highways. But in case the said second party shall fail to make the payments aforesaid, or any of them, punctually and upon the strict terms and times above limited, and likewise to perform and complete all and each of his agreements and stipulations aforesaid, strictly and literally without any failure or default, the times of the payments as above specified being the essence of this agreement, then the first party, at his option, shall have the right to declare this agreement null and void, and all rights and interest hereby created, or now existing, in favor of said second party, or derived under this agreement, shall utterly cease and determine, and the premises hereby contracted shall revert to and invest in said first party (without any declaration or forfeiture or act of re-entry, or without any other act by said first party to be performed, and without any right of said second party for reclamation or compensation for money paid or improvements made) as absolutely, fully and perfectly as if this contract had never been made. Witness our hands the day and year first above written."

Defendant testified:

"At the time I signed this contract, the plaintiff told me he had paid $125 an acre for the Osceola County land. He said he was turning it over to me for just what it cost him. He represented to me at the time that the parties in the east who owned the Osceola County land would take my Dakota land. I didn't know what plaintiff paid for the land other than as he stated it to me. I believed then that he had paid $125 an acre for it. The next conversation I had with the plaintiff, Mr. Scott, after the written contract was signed, was on the 1st of March, at the time the deeds were exchanged. We had exchanged abstracts prior to that,

and they were found all right. At the March meeting, I delivered to him my deed to the Dakota land, and he delivered to me his deed to his Osceola County land. After the deeds were exchanged, the plaintiff said, 'I guess that is all now; it is all done but the passing of the money.' "

Thereupon the defendant informed the plaintiff that he knew that plaintiff had paid only $80 an acre for the land, and said to plaintiff that he would settle only on that basis for the Osceola land. Defendant refused to return plaintiff's deed, though requested to do so. There was nothing said about returning the $1,000, nor was it demanded. It appears that the defendant had learned as early, at least, as January, that plaintiff paid only $80 an acre, but no mention was made of this fact until after the deeds were delivered and the exchange consummated.

Defendant testified:

"When I exchanged those deeds in March, 1915, I had no other reason for not paying the balance of the money to Mr. Scott than that he told me he had paid $125 an acre for the Osceola County land, when in fact he had paid only $80 an acre. I made no objection to consummating the contract until after the deeds were passed. I received the deed to the Osceola County land, and he accepted my deed to the Dakota land. I had been told by the former owners of the Osceola County land, the persons from whom Mr. Scott bought it, that Mr. Scott had in fact paid only $80 an acre. I knew from whom he had bought the land, and what he had paid for the land at least as early as January, 1915."

With this knowledge, defendant consummated the contract, the consummation of which he now says worked a fraud upon him. Assuming the facts to be as herein set out, it is apparent that, upon discovering the fraud, defendant could have retired from performance. It was open to him to perform the contract or rescind it. It is a rule, to which

there is no exception, that the defrauded party may rescind an executory contract and retire from the performance and put the contract at an end; or, if the contract is executed, he may retain what he has received and sue for and recover damages on account of the fraud. This is elementary. The general rule in case of fraud and deceit is that the party defrauded has two remedies: First, he may rescind the contract by restoring what he has received under it, or offering to restore it; or he may affirm the contract, retain whatever he has received under the contract, and resort to an action for damages for the fraud practiced upon him. One induced to enter into a contract through fraud has the right, upon discovering the fraud, to rescind, though the contract be executed, by restoring or tendering back what he has received under the contract; or he may, at his election, retain what he has received under the contract, and sue and recover whatever damages he has sustained on account of the fraud. Where, however, the contract is executory, and the party alleged to be defrauded discovers the fraud that worked injury before he is called upon to perform and before he has suffered any damage, and refuses to exercise his right to retire from the contract unhurt, and proceeds to its consummation to his injury, he thereby waives any right to recover for the self-inflicted injury. The injury from the fraud arises only out of the consummation. He cannot be heard to say:

"I knew all the facts before I proceeded to the fulfillment of the contract, and knew that to fulfill it would be to work an injury. I am injured just as I knew I would be. Now pay me for my hurt."

The fraudulent representations, in and of themselves, work no injury. It is the consummation of the contract induced by the fraud that works the injury, and, where the person knows of the fraud before the contract is consummated, and has a right, under the law, to retire from the

contract without injury to himself, he cannot be heard to say:

"I knew the contract was not binding upon me because of the fraud, and I knew I could retire from it without injury to me, yet I elected to go on and perform the contract, and I am hurt. I hold you for all damages sustained by the consummation of the contract on my part."

In other words, he cannot be permitted to say:

"I knew that your representations were false. I was not deceived by them at the time the contract was consummated. No injury could have been worked on me had I retired, as I had a right to do, from the consummation of the contract. All the injury I have sustained results from this consummation, yet I will hold you liable for this injury."

Would the fact situation be any different had the plaintiff said to the defendant, before the deeds were exchanged:

"I lied to you when I said I bought that land for $125 an acre. I paid only $80 an acre. Do you desire to proceed to the fulfillment of the contract as written, or do you wish to retire from the contract?" And if the defendant had said: "I will proceed with the contract as written," and the deeds were then exchanged, would the defendant have known more, or would his rights be other or different had the plaintiff so informed him before the deeds were exchanged? Plaintiff evidently formed in his mind a purpose not to perform the contract as written, as soon as he learned of the misstatement of the plaintiff touching the amount paid for the land; yet, with that purpose uncommunicated, he proceeded to the consummation of the contract as written, and only insisted upon what he now claims to be his right after he had received from the plaintiff all that the contract called upon the plaintiff to give. A different situation might exist had the defendant notified the plaintiff that he would not perform the contract as written, and would

not pay the price stipulated in the contract, but would insist upon the price which he claimed that the plaintiff's statements bound the plaintiff to accept, in lieu of what was written in the contract, and plaintiff had then exchanged deeds. A different situation would arise if, before the consummation of the contract, he had demanded his $1,000 back, and the plaintiff had refused to pay it, or had refused to recognize his right to retire from the contract. Defendant had paid $1,000 at the time the contract was entered into. The record shows that the plaintiff is perfectly solvent, and good for the amount paid; that the defendant did not know to the contrary, and made no inquiry to determine that fact. We think that, under the record herein disclosed, he waived his right now to insist upon damages, if any, that flowed only from the consummated contract under the circumstances disclosed here.

2. FRAUD: actions: waiver: accepting deed with knowledge of fraud: ratification.

Thus far we have discussed the case on the theory that the only basis for recovery on the part of the defendant on his counterclaim rests on the theory that the contract was induced by fraud, and that the fraud consisted in misrepresenting the amount which plaintiff had actually paid for the land. Further, the deed from plaintiff to defendant recited:

"We, T. P. Scott and Dora Scott, his wife, * * * in consideration of the sum of twenty-four thousand four hundred three and 75-100 dollars, and the sum of fifteen thousand dollars, represented by the two mortgages hereinafter described, and assumed by the grantee herein (being the amount stipulated to be paid in the original contract), in hand paid by N. C. Simons, * * * do hereby sell and convey," etc.

When he received the deed therefor, there was a new contract made between the parties, by which the defendant ratified the amount stated in the original contract as the

consideration, and, by accepting the deed, assumed and
agreed to pay the same, notwithstanding his knowledge of
the fraud upon which he now relies.   We think plaintiff,
therefore, with knowledge of the fraud upon which he now
relies, ratified the original contract, and reaffirmed his
purpose to pay the consideration stipulated in the original
contract, and. thereby waived the claim which he now as-
serts, to have the land at a smaller sum than was therein
stipulated.   Further than that, by such ratification and re-
affirmance of his purpose to pay the price stipulated in the
original contract, he induced the plaintiff to accept the
Dakota land at a valuation of $11,000, when, in truth and
in fact, as this record discloses, this Dakota land did not
exceed in value $4,000.

As sustaining the doctrines herein announced, see *Hart-
ford Life Ins. Co. v. Hanlon,* (Ky.) 104 S. W. 729; *Simon v.
Goodyear Metallic Rubber Shoe Co.,* 44 C. C. A. 612 (52
L. R. A. 745).   In that case, the action was for fraud and
deceit in the procurement of a contract for the sale of rubber
waste, and to recover damages sustained by plaintiff in the
execution of the contract.   It appears that the representa-
tions which induced the contract, on the procuring of which
the fraud was predicated, were either promissory in charac-
ter or true in fact; second, that the contract was largely
executory when the plaintiff acquired full knowledge of the
fraud which induced the contract, and with such knowledge
proceeded to execute it according to its terms.   The court
said:

"The fact that the defendant insisted upon performance,
and that the plaintiff intended to perform and then sue to
recover the loss growing out of performance, cannot alter
the principle.   The plaintiff was under no legal compulsion
to go on.   What he subsequently did was in execution of the
contract.   The deliberate execution of it was an adoption
of it with knowledge of the deceit, and in contradiction

of his purpose to sue for deceit practiced in its procurement. He cannot save his right to sue for the fraud by notice that he will do so if he perform, and exact performance with full knowledge of the facts which rendered performance non-obligatory. Neither can the action be saved, after such voluntary performance, to the extent of the damage sustained by partial performance before full knowledge of the deceit. His duty was 'to stop short or go on with it,' to use the expression of Judge Bronson in *Railroad Co. v. Row*, 24 Wend. 74. The execution of the contract, so far as it was executory after full knowledge of the fraud, is equivalent to an adoption of the contract with knowledge of all the facts. A subsequent promise, with full knowledge of the facts, is certainly equivalent to an original promise made under similar circumstances; and no one acting with full knowledge can justly say that he has been deceived by false representations," (citing authority).

In *Selway v. Fogg*, 5 Mees. & W. 83, 85, Baron Parke, speaking for the court, said:

"I also think that, upon discovering the fraud (unless he meant to proceed according to the terms of the contract), the plaintiff should immediately have declared off, and sought compensation for the by-gone time in an action for deceit; not doing this, but continuing the work as he has done, he is bound by the express terms of the contract, and if he fail to recover on that, he cannot recover at all."

See also *Vernol v. Vernol*, 63 N. Y. 45. In this case, the plaintiff made and entered into a written agreement with one Robinson, by which Robinson agreed to convey to the plaintiff a certain house and lot for the price of $5,250. Subsequent to the making of said written agreement, the plaintiff represented to the defendant that he bought said property of Robinson for $6,000, and that defendant could have it for what he paid Robinson for it; that plaintiff would not make a cent on it. The defendant verbally agreed

with the plaintiff that he would take said property and pay therefor the price aforesaid, $6,000, the defendant then believing that plaintiff had paid Robinson $6,000. After making this agreement with plaintiff, the defendant learned that plaintiff had paid Robinson only $5,250 for the house. With plaintiff's consent, Robinson conveyed the premises to the defendant, who paid therefor the sum of $5,250. The action is brought by the plaintiff to recover the difference between $5,250 and $6,000. The court said:

"Assuming that the contract between the plaintiff and the defendant was originally a valid one, when the defendant ascertained that the price which the plaintiff was to pay had been misrepresented, he was exonerated from any obligation to fulfill his contract, and would have been fully justified in repudiating the same. The false representations made would have been an ample excuse for his nonperformance. While such was the case, the defendant could not avail himself of these false representations to excuse the payment of the price agreed upon [$6,000] if he took the conveyance, and as he chose to carry the contract into execution, he was bound to pay the plaintiff the balance of the consideration money. If the contract had been in writing, and the plaintiff had brought an action to compel a specific performance upon defendant's refusal to fulfill, the false representations would have been a complete defense. But after the defendant had taken the deed, it would not rest with him to refuse to perform by paying the price agreed upon. He could not reap the fruits of the bargain by taking the property, thus fulfilling in part, and then repudiate the performance of the obligation to pay into which he had entered. Such a course would, under the contract, be advantageous only to one of the contracting parties, and cannot lawfully be upheld. It is to be presumed that the deed was delivered to the defendant in accordance with the agreement proved, and, although the judge did not find the fact

specifically, the findings show that such must have been the case. No other agreement was found to have been proven, and it is fairly to be inferred from the facts that the contract proved was fulfilled by the conveyance to the defendant. No other legitimate conclusion can be arrived at, and such being the case, it was not necessary to prove a promise to pay the plaintiff the amount claimed when the deed was delivered. The promise to pay was comprehended in the agreement, and it may be inferred from the very fact that the deed was accepted by the defendant."

See also *Tuttle v. Stovall*, 134 Ga. 325 (67 S. E. 806, 20 Am. & Eng. Ann. Cas. 168). In this case it is said:

"It cannot be said that merely affirming the contract by the defrauded party will necessarily deprive him of the right to sue for damages for the fraud inducing him to make the contract, as the right to affirm the contract and the right to sue for damages for the fraud co-exist. While the defrauded party may affirm the contract and sue for damages for the fraud, this right of affirmance, with a saving of the right to sue for damages, has its limitations, in that the defrauded party, in order to preserve his right to sue for damages for the fraud, must do no act in affirming the contract, or otherwise, which waives the fraud. If the defrauded party, with knowledge of the fraud, does any act in ratifying or affirming the contract which shows his intention to abide by the contract as made with the fraud in it, and thus waives the fraud, he cannot afterwards set up the fraud and recover damages therefor."

II. It is claimed, however, that the 3. PRINCIPAL AND plaintiff was the defendant's agent at the AGENT: the relation: termination: brokers. time of the consummation of this contract, and therefore he cannot reap any benefit to himself through the consummation of the contract.

The record shows that whatever agency there was between the plaintiff and the defendant related to the sale

or trading of the Dakota land. Plaintiff was not authorized to buy the Osceola County land for the defendant. He was not his agent for that purpose. He was in no way authorized by the defendant to purchase the land for him; nor was the defendant in any way bound to take the land off the plaintiff's hands after he purchased it. No agreement had been made, before the purchase, to take this Osceola County land off the plaintiff's hands. In the purchase of the Osceola County land, the defendant was not consulted, nor did any contractual relationship between the plaintiff and the defendant grow out of its purchase. Upon the purchase of the Osceola County land, the plaintiff became the absolute owner of it, independent of any relationship existing between him and the defendant. The defendant was informed of his purchase before the written contract was made, knew that he was dealing with plaintiff, as owner of this land, before the written contract of exchange was made. We have this situation, then: Plaintiff, at one time, was the agent of the defendant for the sale or exchange of the Dakota land. Thereafter, plaintiff purchased some land on his own account, and offered to exchange it with the defendant for the Dakota land; offered to exchange it on the basis of $125 an acre for the Osceola County land, and $11,000 for the Dakota land. The defendant then knew that he was dealing with the plaintiff at arm's length; that plaintiff was no longer acting for him in the transaction, but for himself. Each had land to exchange. They exchanged lands with each other, plaintiff acting for himself, defendant acting for himself. The relationship of agency is contractual. Out of that contractual relationship grow duties and obligations on the part of the agent. The agency must exist and continue during the transaction in order that these duties and obligations may exist. When they undertook to deal with each other, each for himself, one exchanging his land for the property of the other, the

relationship of agency ceased, and the duties and obligations of agency disappeared. It is true that, though they dealt at arm's length, neither had a right to fraudulently impose anything upon the other. But, under such circumstances, the same duty to protect does not exist as exists on the part of the agent. It is not believable that defendant, at the time of the consummation of this contract, thought that plaintiff was acting as his agent. Further than that, even if he thought him his agent, he discovered the fraud that he now claims justifies him in seeking damages, before the deal was consummated out of which the damage arose. When the plaintiff said to the defendant, "I am the owner of this Osceola County land; I will trade it to you for your Dakota land," thereafter he ceased to act for the defendant in procuring a sale or in trading his Dakota land, and in no sense could he be understood as acting as the agent of the defendant, either in making the proposition or in consummating the deal growing out of it. We think that, from that time on, no relationship of principal and agent existed between them. Plaintiff was trading his lands for lands owned by the defendant, and the relationship became antagonistic, and not confidential or fiduciary. Each then knew the relationship of the other to the subject matter, and each knew that the other was acting for himself. After this deal was consummated, could the plaintiff for a moment be heard to say that he was entitled to a commission as for the sale of this Dakota land, and if he had sued the plaintiff therefor, would he have any standing in court upon such a claim? We think not.

III. It seems to be claimed by the defendant, however, that the plaintiff cannot recover of the defendant anything in excess of $80 an acre for this Osceola County land, and that, figuring the land at $80 an acre, there is nothing due the plaintiff. This contention is based upon the fact that the plaintiff had purchased it for $80 an acre, and had

said that he would let defendant have it for the same amount that he had paid, asserting that he had paid $125 an acre. The defendant entered into the written contract in which he stipulated that he would pay $125 an acre for this Osceola County land, upon plaintiff's taking in part payment this Dakota land. We may assume that defendant thought at that time that plaintiff had paid $125 an acre. He discovered his error, however, before he made his deed. He did not insist then upon plaintiff's selling him the land at that sum, but took a deed from the plaintiff in which he reaffirms his contract to pay $125 an acre. This was a new contract, made after he had full knowledge of the fact that plaintiff had not paid $125 an acre. It was a ratification of the original written contract to pay $125, notwithstanding the fact that he had discovered that plaintiff had not paid that much for the land.

The court found for the plaintiff, and upon the whole record we think the court was right, and the judgment is therefore—*Affirmed.*

Ladd, Evans and Salinger, JJ., concur.